FILED

**NOT FOR PUBLICATION**

JAN 07 2014

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| THE PRYORS COALITION, a coalition of non-profit organizations and individuals; WILDLANDS CPR, a non-profit organization; EASTERN WILDLANDS CHAPTER OF THE MONTANA WILDERNESS ASSOCIATION, a non-profit organization; YELLOWSTONE VALLEY AUDUBON SOCIETY, a non-profit organization; THE FRONTIER HERITAGE ALLIANCE, a non-profit organization; THE BEARTOOTH BACKCOUNTRY HORSEMEN, a non-profit organization; RICHARD WALTON, an individual; SUSAN W. NEWELL, an individual; PHIL JAQUITH, an individual, <br><br> Plaintiffs - Appellants, <br><br> v. <br><br> LESLIE WELDON, in her official capacity as Regional Forester for the United States Forest Service, Region One; MARY ERICKSON, in her official capacity as Acting Forest Supervisor of the Custer National Forest; UNITED STATES FOREST SERVICE, an agency of the | No. 11-35733 <br><br> D.C. No. 1:10-cv-00016-RFC <br><br> MEMORANDUM[*] |

---

[*]    This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

United States Department of Agriculture,

Defendants - Appellees,

TREASURE STATE ATV ASSOC.;
MONTANA TRAIL VEHICLE ASSOC.;
GREAT FALLS TRAIL BIKE RIDERS
ASS'N; FAMILIES FOR OUTDOOR
RECREATION; CITIZENS FOR
BALANCED USE; THE BLUERIBBON
COALITION,

Intervenor-Defendants - Appellees.

Appeal from the United States District Court
for the District of Montana
Richard F. Cebull, Senior District Judge, Presiding

Argued and Submitted December 4, 2013
Seattle, Washington

Before: O'CONNOR, Associate Justice (Ret.),[**] and TALLMAN and BEA, Circuit Judges.

Plaintiffs-Appellants, a coalition of groups and individuals who use the natural wilderness of the Pryor Mountains ("Coalition"), appeal the summary judgment dismissal of their action challenging the U.S. Forest Service's 2008 Travel Management Plan ("Travel Plan") for Montana's Beartooth Ranger District

---

[**]  The Honorable Sandra Day O'Connor, Associate Justice of the United States Supreme Court (Ret.), sitting by designation.

("District") within the Custer National Forest of south-central Montana. The purpose of the Travel Plan is to identify and designate Forest Service roads and trails for motorized and non-motorized use to provide recreational opportunities for the public. The Coalition brings its challenge under Section 706(2)(A) of the Administrative Procedure Act, which provides that "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Thus, while we review the district court's award of summary judgment de novo, *Te-Moak Tribe of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 608 F.3d 592, 598 (9th Cir. 2010), we "will reverse [the Forest Service's] decision as arbitrary and capricious only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 656 (9th Cir. 2009) (citations and internal quotation marks omitted). We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

I

The Coalition argues first that the Forest Service's "No Action" alternative erroneously treated "user-created routes" as status-quo system routes. It points to the 1987 Travel Plan and maps from 1996 that do not appear to show some or all of the challenged routes shown as in existence in the 2008 Travel Plan. The Forest Service, however, acknowledged that in establishing its "No Action" alternative it relied primarily on "the set of system roads identified in the 1987 Travel Plan *along with modifications* that have been made to the system since 1987." (emphasis added). In 1999, the Forest Service attempted to identify and inventory all motorized and non-motorized routes in the Custer National Forest. It told the public that it had conducted subsequent field reviews and had "a high confidence level in the inventory." The inventory reveals that the Forest Service considered the challenged routes to be existing National Forest System routes rather than unauthorized user-created routes. Importantly, the Forest Service conducted its inventory several years after the creation of the maps relied on by the Coalition. The Coalition presents no evidence postdating the inventory that contradicts the Forest Service's determination. Given this record, we cannot conclude that the Forest Service's reliance on its 1999 inventory to establish its "No Action" alternative baseline was arbitrary or capricious.

From a practical standpoint, the continued designation of these routes did not require additional analysis in the environmental impact statement ("EIS") under the National Environmental Protection Act ("NEPA").[1] *See Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1344 (9th Cir. 1995) ("Discretionary agency action that does not alter the status quo does not require an EIS."); *Upper Snake River Chapter of Trout Unlimited v. Hodel*, 921 F.2d 232, 235 (9th Cir. 1990) ("[W]here a proposed federal action would not change the status quo, an EIS is not necessary."). This is fatal to the Coalition's NEPA challenge.

Alternatively, we are also satisfied that the Forest Service's EIS "fulfilled its informational purpose." *Sierra Club v. Clark*, 774 F.2d 1406, 1411 (9th Cir. 1985). The Forest Service took the requisite hard look at the environmental impacts from the Travel Plan. The Coalition's primary argument to the contrary is that the Forest Service failed to take a hard look at impacts to elk and deer along five high-elevation routes. The Forest Service provided a thorough analysis of impacts to elk in the District. And we defer to its scientific judgment to use elk as a surrogate for mule deer and white-tailed deer, which it justified "because there is a large amount of overlap in habitat between deer and elk, and impacts of travel

---

[1] There is also no evidence that these routes will experience greater environmental impacts merely because they are now signed and mapped.

5

management on the District are expected to be very similar for these species." *See Native Ecosystems Council v. Weldon*, 697 F.3d 1043, 1053 (9th Cir. 2012) ("[W]e are required to apply the highest level of deference in our review of the Forest Service's scientific judgments[.]"). "The mere fact that [the Coalition] disagrees with the methodology does not constitute a NEPA violation." *Id*. The Forest Service also considered resource concerns along the five high-elevation routes—as it did for every route—in its route-tracking spreadsheet. It imposed seasonal restrictions on use of some of the five routes to address resource concerns, and it designated certain portions of the five routes only for administrative use due to erosion concerns. There is nothing arbitrary or capricious about this portion of the Forest Service's NEPA analysis.

## II

The Coalition argues next that the Forest Service failed to apply the minimization criteria provided in the 2005 Travel Management Rule, 36 C.F.R. §

212.55(b) ("TMR").[2] On review of the voluminous records supporting its decision, we disagree that the Forest Service merely listed the minimization criteria without documenting how it minimized environmental impacts.

The Forest Service's consideration and application of the criteria is apparent from the record. It considered numerous alternative plans for route designations based on competing motorized and non-motorized uses. It ultimately modified one of those plans—creating Alternative B Modified—"to provide additional points of compromise among disparate user preference while minimizing effects" on the

---

[2] The parties dispute what the TMR requires of the Forest Service. The Coalition appears to argue that it requires some degree of actual minimization of environmental impacts. The Forest Service interprets the TMR's minimization criteria as "objectives that the agency must evaluate in designating trails and areas, rather than required outcomes." Travel Management Rule; Designated Routes and Areas for Motor Vehicle Use, 69 Fed. Reg. 42381-01 at 42387 (July 15, 2004). We need not resolve this dispute, as we conclude that the Forest Service met its obligations even if it was required to show actual minimization. Nor must we decide whether the Coalition can privately enforce Executive Order 11644 because the Coalition asserts that "both E.O. 11644 and the [TMR] contemplate the same result."

TMR's environmental criteria.[3]  Specifically, it reduced the total mileage of motorized routes from approximately 150 to 125.  It made a number of its route designations contingent on first reducing negative impacts to soil, fisheries, and water quality.  It avoided route designations that would clearly contribute to unacceptable resource impacts, for example, by not allowing public motorized use on routes 21401A, 21401B, and 241412 to minimize impacts to water quality.  And it imposed seasonal restrictions on roughly 64 miles of routes to reduce impacts on soil, vegetation, water quality, and wildlife.  Notably, the seasonally restricted routes included 2088, 2091, and 2095A—three of the higher-elevation routes the Coalition identifies as traversing sensitive areas.

On this record, we are satisfied that the Forest Service did not act arbitrarily or capriciously in applying the TMR's minimization criteria to its route designations.  Nor were the Forest Service's minimization actions "plainly

---

[3] The Coalition points to Meyers Creek trail as one example where the Forest Service failed to minimize use conflicts.  This assertion is belied by the record.  Alternative B Modified was selected, in part, "because it responds to users['] requests to keep Meyers Creek [trail] . . . available for motorcycle use, but includes a season of use designation of 6/15 to 12/1 . . . . [to] provide[] a non-motorized experience during the motorized restricted period" and to "reduce[] concerns about motorized disturbance of wintering big game and moose calving in the vicinity of the trail[]."

erroneous or inconsistent with the language of the regulation[.]" *League of Wilderness Defenders v. U.S. Forest Serv.*, 549 F.3d 1211, 1218 (9th Cir. 2008).

## III

The Coalition also attacks the Forest Service's decision to allow off-road vehicle camping within 300 feet of all public motorized routes in the Pryor Unit. Like its challenge to the Forest Service's route designations, the Coalition claims that the Forest Service did not take the requisite "hard look" under NEPA or apply the TMR's minimization criteria. We disagree.

We note at the outset that off-road vehicle camping appears to have been permitted before the Travel Plan was enacted, either by virtue of the 1987 Travel Plan or the 2001 Off-Highway Vehicle Travel Plan. We are reluctant, however, to divest the Forest Service entirely of its obligation to conduct a NEPA analysis, *see Hodel*, 921 F.2d at 235, as both the 1987 Travel Plan and the 2001 Off-Highway Vehicle Travel Plan included restrictions on off-road vehicle camping that the

current 2008 Travel Plan may not.[4]  Thus, while the Travel Plan may have altered the existing off-road vehicle camping regulations, it did not uproot the status quo entirely.

A

The Forest Service's vegetation analysis satisfied NEPA requirements.  It relied primarily on satellite-assisted Geographical Information System ("GIS") methods to identify vegetation risk categories based on (1) the frequency, duration, and timing of motorized travel, and (2) the resistance and resilience of vegetation to trampling.  It used this risk stratification to describe how many acres of low, moderate, and high risk areas could be impacted by off-road vehicle camping.  It concluded that, under Alternative B Modified, the "[p]otential impacts from frequent motorized use [in high risk areas] constitute about 2% . . . of the total Pryor Unit."  It further explained that, "While impacts resulting from camping . . .

_____

[4] For example, the 1987 Travel Plan allowed visitors to drive 300 feet off designated routes to access campsites, but required travel on an existing access road to the site.  The 2001 Off-Highway Vehicle Travel Plan allowed off-road vehicle camping within 300 feet of roads and trails, but required visitors to select campsites by non-motorized means and access the campsites by the most direct route causing the least damage.  The Forest Service contends that, under the 2008 Travel Plan, recreationists must still drive the most direct route to their off-road campsite.  We find no such requirement in the Record of Decision or the final EIS.  It would thus behoove the Forest Service to include this restriction, if it exists, on its Motorized Vehicle Use Map for the area.  But that correction does not mandate vacating the entire decision and remanding to the district court.

10

can be locally very significant, the total area of impact is small when compared to various ecosystems of the project area," and that "[s]election of any alternative would be consistent with the regulatory framework relative to vegetation sustainability at the level of this project's scale." It is clear that the Forest Service's analysis contained significantly more than vague and conclusory statements, as alleged by the Coalition.

We are not convinced that the Forest Service's GIS methodology was unreliable or that reliance on GIS methods was arbitrary or capricious. *See Native Ecosystems Council*, 697 F.3d at 1053 ("We are required to apply the highest level of deference in our review of the Forest Service's scientific judgments[.]"). Nor was the Forest Service required to supplement its analysis with on-the-ground testing or studies. *See Lands Council v. McNair*, 537 F.3d 981, 991-92 (9th Cir. 2008) ("The Forest Service is at liberty, of course, to use on-the-ground analysis if it deems it appropriate or necessary, but it is not required to do so.").

We also find unpersuasive the Coalition's argument that "the Forest Service *may* have made a significant error in its GIS analysis by underestimating the size of the potential use corridor" by analyzing a 300 foot buffer instead of a 600 foot buffer. Even if the single map identified by the Coalition contained such an error, we see nothing in the record demonstrating whether or how this map was used in

11

the Forest Service's NEPA analysis.  Indeed, this spatial analysis appears to be one of several, as the map's cover page explains that "[f]urther GIS runs were made per methodology outlined" in the final EIS.

The Coalition also fails to provide a cite to the administrative record supporting its assertion that GIS mapping cannot identify campsites smaller than 10,000 square feet.  Even if true, we find no support for the Coalition's conclusory assertions that smaller campsites "are much more common and likely used" than larger campsites, or that "driving off-road to car camp in small to moderate areas has just as much impact as driving to large flat areas."  Furthermore, despite the Coalition's argument to the contrary, the Forest Service did analyze both flat areas (0–4 percent slopes), which it designated as "frequent use areas," and non-flat areas, which it labeled "infrequent use areas."  In short, it is beyond our role to "insert our opinions in the place of those of forest [scientists]," *Native Ecosystems Council*, 697 F.3d at 1053, and we again decline to do so here.

The Coalition takes issue with the Forest Service's assumption that not all areas within the off-road vehicle camping corridor will be traveled because visitors must take a direct route to campsites.  Even if the Forest Service's assumption is faulty, it nevertheless analyzed potential environmental impacts based on total acreage, not just the subset of acreage that it believed would be impacted by direct-

12

route traveling. Nothing in this record leads us to conclude that the Forest Service's vegetation impacts analysis was arbitrary or capricious.

Neither was the Forest Service's soil analysis. The Forest Service relied heavily on a 1975 Soil Survey of Montana's Carbon County ("Survey") to describe land formations and determine erosion hazards in the Pryor Unit. The Survey is maintained on the U.S. Department of Agriculture's website. Relying on the Survey, along with a number of additional sources, the Forest Service estimated the potential for erosion after soil disturbance, including the number of miles of roads and trails that would traverse low, medium, high, and very high risk erosion areas.

In response to public requests, the Forest Service also added a discussion of soil crust impacts in the final EIS. It concluded that soil crusts are probably very limited in the Pryor Unit and would likely not exist in areas popular for off-road vehicle camping, i.e., high elevation areas with higher vegetative cover and some shade. Instead, soil crusts are typically found in high elevation areas with bare ground, or at lower elevations. That it was unable to locate information on the distribution and extent of soil crusts in the specific project area does not render its analysis inadequate.[5] The Coalition contends that the Forest Service should have

_____

[5] The Survey did not contain soil crust data, and the Soils State Office in Bozeman, Montana, had no knowledge of any soil crust studies in the Pryor Unit.

13

conducted its own soil crust studies, presumably throughout the 8,900 acres—approximately 14 square miles—it claims will be impacted by off-road vehicle camping. We disagree, as "NEPA does not require the government to do the impractical." *See Inland Empire Pub. Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 764 (9th Cir. 1996) (citation omitted).

Finally, we reject the Coalition's contention that the Forest Service needed to rely on its own soil quality standards. The Coalition concedes that "nothing in NEPA mandates compliance with soil standards." Moreover, as a supplement to the Forest Service Manual, the soil standards do not have the force and effect of law. *See W. Radio Servs. Co. v. Espy*, 79 F.3d 896, 901 (9th Cir. 1996) (finding that the Forest Service Manual is "not promulgated in accordance with the procedural requirements of the Administrative Procedure Act," is "not [a] regulation[]," and thus "do[es] not have the independent force and effect of law").

We conclude that the Forest Service took the requisite hard look at the environmental impacts from continuing to allow off-road vehicle camping along public motorized routes.

B

The Forest Service also took several steps to minimize off-road vehicle camping's environmental impacts, and thus complied with the TMR's

14

minimization criteria. Its initial analysis revealed that "[e]ffects from dispersed vehicle camping have been observed at site-specific locations and [are] not widespread along the District's motorized routes." Accordingly, it used the existing 300 foot standard "as the starting point and considered alternatives to this standard where there was a need to do so." Alternative B Modified "specifically address[ed] where there have been resource issues with allowing 300 foot dispersed vehicle camping[.]"[6]

Several more general actions as part of Alternative B Modified will also directly alleviate environmental impacts from off-road vehicle camping. The Forest Service purposely declined to designate a number of roads and portions of roads for motorized use because of the impacts on cultural resources, water quality, and erosion. This will prevent off-road vehicle camping in the same sensitive areas. The Forest Service reduced the miles of motorized routes (and thus the amount of acreage open to off-road vehicle camping) from approximately 150 to 125. It prohibited off-road vehicle camping along 27 miles of non-system routes. It designated 18 miles of system roads for administrative use only, along which

_____

[6] For example, in the Beartooth Unit the Forest Service prohibited off-road vehicle camping within 100 feet of the West Fork of Rock Creek or its tributaries, limited off-road vehicle camping along the Main Fork of Rock Creek to one vehicle length from the edge of designated spurs off system road 2421, and closed over 20 camping sites due to environmental resource concerns.

15

off-road vehicle camping is prohibited. And it imposed seasonal restrictions on roughly 64 miles of routes, including higher elevation routes 2088, 2091, and 2095A, the same sensitive routes with which the Coalition is particularly concerned. Seasonal closures during the spring thaw will protect not only the roads and trails, but also the adjacent land that would otherwise have been open for off-road vehicle camping.

These steps satisfy us that the Forest Service "consider[ed] effects on" the TMR's environmental criteria "with the objective of minimizing" the environmental impacts from off-road vehicle camping. *See* 36 C.F.R. § 212.55(b).

\* \* \*

We are mindful of the Coalition's interest in non-motorized recreation opportunities in the Pryor Unit and of the considerable environmental resources at stake. But we must give deference to the Forest Service's actions unless they were arbitrary, capricious, an abuse of discretion, or contrary to law. *See* 5 U.S.C. § 706. Here, they were not. The Forest Service complied with NEPA, the TMR, and Executive Order 11644.

AFFIRMED.