**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 3, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

BIODIVERSITY CONSERVATION
ALLIANCE,

        Petitioner - Appellant,

v.

UNITED STATES FOREST
SERVICE,

        Respondent - Appellee.

No. 12-8071

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**
**(D.C. NO. 2:11-CV-00226-SWS)**

---

John Meyer, Cottonwood Environmental Law Center, Bozeman, Montana (John Persell, Biodiversity Conservation Alliance, Laramie, Wyoming, and Megan Hayes, Corthell and King, P.C., Laramie, Wyoming, with him on the briefs) for Petitioner-Appellant.

Mark R. Haag, United States Department of Justice, Environment & Natural Resources Division, Washington, D.C. (Robert G. Dreher, Acting Assistant Attorney General, John P. Tustin and Robert P. Stockman, United States Department of Justice, Environment & Natural Resources Division, Washington, D.C., and Randy Bramer, Senior Counsel, Office of the General Counsel, United States Department of Agriculture, Golden, Colorado, with him on the brief) for Respondent-Appellee.

---

Before **TYMKOVICH**, **McKAY**, and **MATHESON**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

Biodiversity Conservation Alliance challenges a United States Forest Service decision modifying trail use in the two-million-acre Medicine Bow National Forest in southern Wyoming. In particular, the Forest Service formally closed several hundred miles of unauthorized motorized trails, but allowed motorcycle use on an approximately five-mile trail in the Middle Fork Inventoried Roadless Area (Middle Fork IRA) and several connecting trails. The Alliance (BCA) argues the Forest Service did not properly consider the impacts on wetlands and non-motorized recreation in reaching its decision, and should have found that significant impacts required the preparation of an Environmental Impact Statement under the National Environmental Policy Act (NEPA).

We find the Forest Service's Environmental Assessment adequately supported its finding that the proposed decision would have no significant impacts on wetlands or other users of the Middle Fork IRA. Accordingly, we affirm the district court and uphold the Forest Service decision.

## I. Background

This case arises out of the Forest Service's efforts to manage motorized recreation in and around the Middle Fork IRA, a 13,232-acre portion of the Laramie Ranger District of the Medicine Bow National Forest near Centennial, Wyoming. Before 2000, motor vehicle users were not restricted to authorized

vehicle routes, and they created a network of unauthorized roads and trails[1] in the Laramie Ranger District and elsewhere. For instance, users created a 4.7-mile, single-track motorcycle trail known as the Albany Trail. The Albany Trail, now over 30-years-old, is located in the Middle Fork IRA.

In 2000, the Forest Service issued new travel management regulations to mitigate adverse impacts of the unmanaged, off-road travel. The decision announced that the unauthorized routes causing especially severe environmental impacts would be immediately closed. Meanwhile, other routes, including the Albany Trail, remained open until the Forest Service completed site-specific analyses.

In 2006, the Forest Service issued a draft of the Environmental Assessment (EA) for Travel Management in the Eastern Snowy Range of the Laramie Ranger District. The draft EA assessed a "Proposed Alternative," "Alternative 2," and a "No-Action Alternative." As required under the Endangered Species Act, the Forest Service also completed a Biological Assessment, which it performed in three stages: an initial assessment in 2005, an addendum in 2006, and a second addendum in 2007. The second addendum focused primarily on analyzing the impact of authorizing motorcycles on the handful of trails in the Middle Fork IRA, including the Albany Trail.

---

[1] A "road" is a vehicle route wider than 50 inches, and a "trail" is a route narrower than 50 inches. 36 C.F.R. § 212.1. "Route" is a general term used to describe either a road or a trail.

After completing the requisite notice and comment procedure, the Forest Service issued its final EA. Alongside the final EA, the Forest Service issued two Findings of No Significant Impact (FONSI) and accompanying decisions. The first FONSI declared that the EA's proposal to open some trails across the region, totaling 92 miles, and to close other trails, totaling 292 miles, to motor vehicle use would not have a significant impact, and the Forest Service issued a notice of decision adopting that approach. BCA is not challenging this decision.

The second FONSI and decision authorized use of the Albany Trail and 6.1 miles of connecting trails by motorcycles (but not four-wheeled vehicles). A total of 5.8 miles of that trail, including the Albany Trail itself, is within the Middle Fork IRA. Taking that action required amending the applicable forest plan to change the designation of the relevant portion of the Middle Fork IRA from "summer non-motorized" to "back-country recreation, year-round motorized."

BCA challenged the Albany Trail decision. After the Forest Service upheld it in 2007, BCA brought an action in the district court, alleging violations of NEPA, the National Forest Management Act (NFMA), and several Forest Service regulations. The district court upheld the agency decision, and BCA appeals.

## II. Analysis

On appeal, BCA brings only NEPA claims. "[W]e review an agency's NEPA compliance to see whether it is arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." *New Mexico ex rel.*

*Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009)

(internal quotation marks omitted); *see also* 5 U.S.C. § 706(2)(a). "When called

upon to review factual determinations made by an agency as part of its NEPA

process, short of a clear error of judgment we ask only whether the agency took a

hard look at information relevant to the decision." *Richardson*, 565 F.3d at 704

(internal quotation marks omitted). "[D]ocuments prepared as part of NEPA's

hard look requirement must not only reflect the agency's thoughtful and probing

reflection of the possible impacts associated with the proposed project, but also

provide a reviewing court with the necessary factual specificity to conduct its

review." *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 781

(10th Cir. 2006) (internal quotation marks omitted).

"An agency's decision to issue a FONSI and not prepare an EIS

[Environmental Impact Statement] is a factual determination which implicates

agency expertise." *Utah Shared Access Alliance v. U.S. Forest Serv.*, 288 F.3d

1205, 1213 (10th Cir. 2002). NEPA regulations give guidance to an agency's

review and consideration of significant impacts underlying a decision. When

assessing the significance of an impact (the question at issue here), an agency

must consider both context and intensity. 40 C.F.R. § 1508.27.

> Context [] means that the significance of an action must
> be analyzed in several contexts such as society as a
> whole (human, national), the affected region, the

> affected interests, and the locality. Significance varies
> with the setting of the proposed action. For instance, in
> the case of a site-specific action, significance would
> usually depend upon the effects in the locale rather than
> in the world as a whole. Both short- and long-term
> effects are relevant.

§ 1508.27(a). And "intensity [] refers to the severity of the impact."

§ 1508.27(b). In addition, the regulations point to a number of non-exclusive

factors that inform an evaluation of intensity, including both beneficial and

adverse impacts on public safety, historic places, and listed species as well as

cumulative impacts and unknown risks. *Id.* Two of the factors set forth in the

regulations are especially relevant here: (1) the "[u]nique characteristics of the

geographic area such as proximity to historic or cultural resources, park lands,

prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas";

and (2) "[t]he degree to which the effects on the quality of the human

environment are likely to be highly controversial." *Id.* at § 1508.27(b)(3)–(4).

BCA contends the Forest Service failed in two ways to satisfy NEPA's

requirements. First, BCA argues the Forest Service failed to take a hard look at

the impact on wetland areas known as fens.[2] Second, it argues the Forest Service

failed to acknowledge a substantial controversy regarding the Albany Trail

---

[2] According to the EA, "[f]ens are wetlands with water-saturated substrates and an accumulation of about 30 cm or more of peat (organic soil material)." App. 125. "[M]any of the fens of [the Rocky Mountain Region] are over 10,000 years old, with organic soil accumulation rates ranging from about 4 to 16 inches per thousand years. Because the rate of accumulation is so slow, these ecosystems are essentially irreplaceable." *Id.*

decision's effect on non-motorized recreation such as hiking and wildlife viewing. As a result, BCA says the agency was required to prepare a full Environmental Impact Statement before issuing the Albany Trail decision.

We discuss each argument in turn and uphold the Forest Service's decision.

### A. *Impact on Fens*

BCA first argues that the Forest Service failed to consider the unique characteristics of the area around the Albany Trail. In particular, BCA suggests the Forest Service failed to take a hard look at the impact of motorcycle use on the surrounding fens.

In the EA, the Forest Service concluded that, "[a]lthough 5.8 miles of motorized trail are proposed for designation within the Middle Fork IRA, this action is not expected to significantly impact" the fens within the project area. App. 84. As an initial matter, the Forest Service recognized that there are six potential fens within the project area and the Albany Trail crosses three of them. According to the Forest Service's Biological Assessment, "[m]otorized trail use can change soil properties and infiltration of precipitation thus changing the growing environment for plants. Recreational use within wetland/fen areas could remove and/or injure plants, alter soil properties, change the hydrologic regime and/or reduce the overall vigor of round leaf sundew." App. 315.[3]

---

[3] In this section, the EA also notes that the worn path may impact particular plants and draw livestock and game to the fens. App. 316 ("This

(continued...)

But the Forest Service concluded that the damage had already been done: "The motorcycle trail in the Middle Fork IRA has been there for over 3 decades and the wet areas have had corduroy laid down (logs laid in the stream/wetland to stabilize the trail surface and raise it from flowing water). Most direct effects occurred in the first 2 years of trail establishment and at the time the corduroy was laid down." *Id.*

### 1. Baseline

BCA first argues that the Forest Service improperly assumed that the effects created by "previous illegal users are not significant,"[4] Aplt. Br. at 30, without "detailing what those impacts were or why they were not significant." Reply Br. at 24. But the Forest Service made no such assumption, and its EA recognizes the impact of prior use. BCA's argument, in essence, asks the Forest Service to assume the Albany Trail never existed as a baseline for the NEPA analysis.

---

[3](...continued)
alternative has new trail designation that crosses three areas identified as having characteristics of riparian, wetlands and potentially fens. Round leaf sundew occurs in sedge dominated fens. Sedges are often palatable to livestock, packstock and big game, therefore this species could be indirectly subject to browsing and/or trampling impacts. In general, livestock avoid fens with quaking mat components because of the instability but will create or use paths worn into the fen vegetation to reach water. Concentrated livestock use in fen habitat could alter the hydrology and water quality of this habitat." (citations omitted))

[4] It is worth noting that, although the motorized use was not authorized by the 2003 Forest Plan, it does not constitute an "illegal" use.

NEPA requires analysis of "major Federal actions." 42 U.S.C. § 4332. BCA suggests that the Forest Service failed to prevent certain past uses and accordingly asks the Forest Service to consider the impact not only of its actions but also of its inaction in preventing harm. Governmental inaction will generally not constitute a major federal action "where that failure to act is not otherwise subject to review by the courts or administrative agencies under the Administrative Procedure Act or other laws." *Mayaguezanos por la Salud y el Ambiente v. United States*, 198 F.3d 297, 301 (1st Cir. 1999) (citing 40 C.F.R. § 1508.18 (defining a "major federal action")). Thus, "NEPA cannot be used to make indirectly reviewable a discretionary decision not to take an enforcement action where the decision itself is not reviewable under the APA or the substantive statute." *Scarborough Citizens Protecting Res. v. U.S. Fish & Wildlife Serv.*, 674 F.3d 97, 102 (1st Cir. 2012); *see also Nat'l Wildlife Fed'n v. Espy*, 45 F.3d 1337, 1344 (9th Cir. 1995) ("Discretionary agency action that does not alter the status quo does not require an EIS"). BCA does not independently challenge the Forest Service's response to previous, unauthorized use under the Administrative Procedure Act or any other substantive statute, and, in that context, BCA may not use NEPA to create an independent pathway for federal courts to review agency inaction.

In general, NEPA analysis uses a no-action alternative as a baseline for measuring the effects of the proposed action. *See* 40 C.F.R. § 1502.14 (requiring that the agency assess a no-action alternative). "The no action alternative may be

thought of in terms of continuing with the present course of action until that action is changed. It establishes a baseline against which the proposed action and its alternatives may be measured." George Cameron Coggins and Robert L. Glicksman, Discussion of Alternatives—The "No Action" Alternative, 2 Pub. Nat. Resources L. § 17:47 (2nd ed. 2014) (internal quotation marks omitted). But, according to BCA, the Forest Service must use the condition of the area *before* motorcycle usage, rather than the status quo, as its baseline.

We have rejected this type of argument before. In *Custer County Action Association v. Garvey*, 256 F.3d 1024 (10th Cir. 2001), the petitioners argued that a federal agency had erroneously included "unlawful activity"—specifically low-level airplane overflights—in its no-action alternative and that a "'true' no-action alternative" may only reflect the impacts of lawful activity. *Id.* at 1040. We were not persuaded and held that, "[i]n requiring consideration of a no-action alternative, the Council on Environmental Quality intended that agencies compare the potential impacts of the proposed major federal action to the known impacts of maintaining the status quo. In other words, the current level of activity is used as a benchmark." *Id.* (citations omitted). We also identified the petitioner's argument as a back door challenge to past agency actions: "The requirement to consider a no-action alternative does not provide Petitioners a vehicle in which to

-10-

pursue allegations that past [agency] actions received insufficient environmental analysis. The time has passed to challenge past actions." *Id.*[5]

For the same reasons, the Forest Service did not violate NEPA in considering the effects of past usage on fens as part of its no-action alternative. The Forest Service properly compared its proposed plan to its no-action alternative—a plan that recognized the effects of previous trail use.

Other courts have concluded that, once the agency authorizes a user-created route, the agency may be required to assess the impacts of that authorization. *See, e.g.*, *Mont. Wilderness Ass'n v. Connell*, 725 F.3d 988, 1008 (9th Cir. 2013) (expressing that a Bureau of Land Management analysis was unsatisfactory in part because it failed to assess the future impact of designating existing user-created routes). But as we explain below, the Forest Service did, in fact, sufficiently evaluate future impacts of its decision to authorize use of the Albany Trail.

Thus, the Forest Service properly employed existing usage as the basis for its no-action alternative and the point of reference for measuring significant impacts.

---

[5] In a case with a fact pattern similar to the instant case, the Ninth Circuit recently rejected this type of argument. *Pryors Coal. v. Weldon*, 551 F. App'x 426 (9th Cir. 2014) (unpublished). That court held the Forest Service did not err in measuring the impact of its action from the status quo, which included routes that had not been the subject of prior NEPA analysis. *Id.* at 429.

## 2. On-Site Visits

BCA next argues that the Forest Service failed to conduct on-site visits to each of three sites identified as potential fens. As a result, it says the agency reached a flawed decision and did not fully understand motorcycle usage's effect on fens.

As a part of its study, the Forest Service identified the relevant fens through a "remote sensing/GIS effort" in 2002–03, App. 126, and also by the work of a botanist, App. 176. The Forest Service then relied on satellite imagery to reach some of its conclusions on the precise location and characteristics of the affected fens. In addition, the record reveals that wildlife biologists walked the Albany Trail. Aple. Supp. App. 22–23.

BCA argues the Forest Service's efforts were not enough. It says the regulations' requirement that the agency evaluate effects on wetlands demands that additional specialists visit each fen and perform full botanical surveys. *See* 40 C.F.R. 1508.27(b)(3). But NEPA does not require the agency to use particular methodologies, and BCA does not point to any case law suggesting that an agency cannot take a hard look at the impact on a particular site unless both botanists *and* wildlife specialists conduct on-site visits. NEPA grants substantial discretion to an agency to determine how best to gather and assess information. *See Utah Shared Access Alliance,* 288 F.3d at 1212–13. And, because the question is whether the agency's decision was arbitrary and capricious, we look to whether the

agency's chosen method is sound, not whether there are competing methods that might work as well. *See id.* ("[C]ourts are not in a position to decide the propriety of competing methodologies, but should simply determine whether the challenged method had a rational basis and took into consideration the relevant factors." (citing *Comm. to Preserve Boomer Lake Park v. U.S. Dep't of Transp.*, 4 F.3d 1543, 1553 (10th Cir. 1993))); *see also Biodiversity Conservation Alliance v. Jiron*, ___ F.3d ___, No. 13-1352, 2014 WL 3827171, slip op. at 75–76 (10th Cir. Aug. 5, 2014).

The Forest Service's chosen method here allowed it to soundly evaluate the impact on fens. Via satellite imagery, the Forest Service evaluated the number of fens potentially affected and the plant life in the fens. It then concluded that motorcycles had been used in those areas for thirty years and that users had already built trails that would accommodate the anticipated amount of future use without further significantly disturbing the fens. Given the deference we owe the Forest Service, we cannot conclude that, absent reasons to question the Forest Service's factual findings, the failure to provide additional study renders the Albany Trail decision arbitrary and capricious.[6]

_____

[6] We note that, while failure to visit each fen does not constitute a NEPA violation, it may violate the Forest Service's Water and Aquatic Standard #15, which requires on-site analysis for every project that takes place within 300 feet of a fen. But the question of whether the Albany Trail decision is consistent with Forest Service policies is not properly before us. Although BCA brought an NFMA challenge before the district court, BCA appeals under NEPA alone.

(continued...)

-13-

### 3. *Hard Look at Adjacent Fens*

BCA next contends that, even if the Forest Service's methodology for gathering information about the surrounding fens was acceptable, the Forest Service failed to take the requisite hard look at the impact of motorized traffic on fens.

According to BCA, because fens have unique value, we should review only portions of the Forest Service's analysis that explicitly discusses fens in particular, without considering analysis of the impact on any other types of riparian landscapes and wetlands. Even if we adopt that premise, however, the Forest Service sufficiently addressed the impact on fens to satisfy the hard look standard.

We determine whether the agency "took a 'hard look' at information relevant to the decision," *Richardson*, 565 F.3d at 704, by asking whether the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "[W]e may not supply a reasoned basis for the agency's action that the agency itself has not given. We will, however, uphold

---

[6](...continued)
Unlike NFMA, 16 U.S.C. § 1604, NEPA does not require consistency with agency policy.

-14-

a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* (citation and internal quotation marks omitted).

The EA itself addresses the impact on fens in several sections. The Forest Service articulates in the EA its goal to avoid damage to fens. *See, e.g.*, App. 190 ("Design criteria: . . . Avoid loss of rare wetlands such as fens and springs"). The EA concluded that authorizing the Albany Trail "is not expected to significantly impact this area." App. 126. The EA also concludes that authorizing the Albany Trail would not significantly impact three plant species of concern that grow in fens. In particular, the Forest Service found that the action "may adversely impact individuals but [is] not likely to result in loss of viability on the Planning Area nor cause a trend toward federal listing or a loss of species viability range wide." App. 91.

In support of these conclusions, the Forest Service also points to its Biological Assessment of the area. The Biological Assessment concluded that continuing use of the Albany Trail will not significantly affect sensitive plant species, including plants that grow in fens.

> Most direct effects occurred in the first 2 years of trail establishment and at the time the corduroy was laid down. Continuing direct effects to *Astragalus leptaleus*, if present, would occur if the trail users establish new routes through wetlands widened the route through use, through sediment from the trail and from hydrologic changes from the crossing area.

Recreational trail use can affect the presence of pollinators that are needed by *Astragalus leptaleus* (Weiss 1999). Pollinators are negatively influenced by the fragmentation produced by motorized routes (Bhattacharya et al. 2003). Motorized trail use can change soil properties and infiltration of precipitation thus changing the growing environment for plants. (Trimble and Mendel 1995).

App. 275.

The Biological Assessment offers similar analyses of the impact on dozens of other plant species that grow in fens. *See, e.g.*, App. 316 ("Motorized trail use can change soil properties and infiltration of precipitation thus changing the growing environment for plants (Trimble and Mendel 1995). Recreational use within wetland/fen areas could remove and/or injure plants, alter soil properties, change the hydrologic regime and/or reduce the overall vigor of round leaf sundew. Recreational trail use can affect the presence of pollinators that are needed by *Drosera rotundifolia* (Weiss 1999). Pollinators are negatively influenced by the fragmentation produced by motorized routes (Bhattacharya et al. 2003). Other effects to *Drosera rotundifolia* would be similar to those described for *Astragalus leptaleus* (see previous section)."). The Forest Service's Report on Species of Local Concern ("Report") also evaluated the impact of its action on plant species native to fens. *See, e.g.*, App. 444 (assessing the impact of opening the Albany Trail on *Carex lasiocarpa* and concluding that most direct effects

occurred within the first two years after trail establishment and at the time the corduroy was laid down).

Although the Endangered Species Act, rather than NEPA, required the Forest Service to prepare the Biological Assessment, 16 U.S.C. § 1536(c)(1), we may look to the findings of the Biological Assessment, as well as the contents of the Report, to determine whether the agency took a hard look at the challenged impact. *See Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 546–47 (11th Cir. 1996) (concluding the Corps of Engineers' preparation of an EA/FONSI for a landfill project met NEPA's hard look requirement because the agency had the benefit of biological opinions, expert opinions, and public hearings); *see also Cascadia Wildlands v. U.S. Forest Serv.*, 937 F. Supp. 2d 1271, 1276 (D. Or. 2013), *appeal dismissed* (Feb. 27, 2014); *Strahan v. Linnon*, 967 F. Supp. 581, 604 (D. Mass. 1997), *aff'd*, 187 F.3d 623 (1st Cir. 1998). By the time the Forest Service made its decision, the agency had identified and considered the impacts it described in the Biological Assessment and the Report. Thus, it is safe to say that the EA, the Biological Assessment, and the Report satisfy NEPA's twin aims of obligating "the agency to consider every significant aspect of the environmental impact" and ensuring "that the agency will inform the public that it has indeed considered environmental concerns." *Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 711 (10th Cir. 2010) (quoting *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97 (1983)).

BCA contends the Biological Assessment and the Report reach only the conclusion that opening the trail will not significantly affect certain plant species. According to BCA, those documents do not address the broader impact on fens generally, and thus the Forest Service did not explicitly indicate that the reasoning in the Biological Assessment and the Report supports its conclusion of no significant impact. BCA identifies that, in addition to the plant species that grow in fens, the Forest Service should have separately considered the impact on soil properties and hydrological function.

But, when the Forest Service analyzed motorcycles' impact on plants that grow in fens, it essentially considered how motorcycles affect the fens. The Biological Assessment indicates that changes in soil properties or hydrologic function would change the growing environment for plants. Thus, we can easily infer that the agency adequately considered the action's impact on soil properties and hydrologic function when it assessed the impact on plant species.[7] In that context, the Forest Service's analysis identifies that, because motorcyclists have been driving on the Albany Trail for decades, the potential damage—not only to sensitive plant species but also to the soils and hydrologic function upon which

---

[7] It is important to note that, because the Forest Service had not done botanical surveys of each of these areas, the Forest Service did not limit its impact analysis to small areas where certain plants were actually present. The Forest Service "assume[d] presence of any species likely to occur in the vicinity of the trail routes," App. 275, and therefore considered the impact on plants and, by extension, soil and hydrologic function, in the wider area.

-18-

those plants depend—had already been done.  That conclusion is reasonable, and we do not see evidence in the record that undermines it.

Thus, we cannot conclude the agency "entirely failed to consider an important aspect of the problem," *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, or that the assessment of the impact on adjacent fens was arbitrary and capricious.

### 4.  Hard Look at Other Fens

Even if the Forest Service successfully took a hard look at the impact on fens immediately adjacent to the Albany Trail, BCA argues the Forest Service failed take a hard look at the impact on the other fens in the area.  Specifically, BCA asks us to conclude that the Forest Service failed to consider the likelihood that opening the Albany Trail would draw additional motorcyclists, who would in turn create new unauthorized routes across fens in other parts of the Middle Fork IRA.

BCA cites the EA for the proposition that opening the Albany Trail will increase the overall number of users, but the EA actually suggests that the Forest Service expects off-road vehicle use in the Medicine Bow National Forest to increase regardless of which alternative the Forest Service selects.

In fact, the Forest Service's concern about the environmental impact of the growing number of users and resulting unauthorized trails is what prompted the agency to consider trail restrictions in the first place and to close numerous trails.  While the Forest Service eventually designated 102 miles of trail for motor vehicle

use, it closed 292 miles to protect against environmental damage as well as conflicts between different types of recreational uses. *See* App. 11, 49.

In that context, the EA directly assesses the impact of future unauthorized use. Of course, the precise number of motorcyclists likely to create new, unauthorized trails is difficult to predict. But the Forest Service's inability to quantify that illegal behavior did not prevent the Forest Service from assessing the relative impact of each of the EA's alternatives. The Forest Service reasonably anticipated that, if it took no action, users would create unauthorized routes at a higher rate. In attempt to counter that trend, the Forest Service identified that,

> by providing a legitimate means for [off-road vehicle] users to derive some of the backcountry motorized experiences they seek, fewer users would be inclined to participate in unauthorized travel (Blahna 2006, USDA 2005, Yankoviak 2000, Crimmins 1999). Motorcycle user compliance would likely see the greatest increase, with little to no increase expected for traditional 4x4 users (since the trail system would not affect their travel options). Increases in regulatory compliance are expected to result in 50 percent less use of unauthorized routes slated for closure. . . . [And] the gradual expansion of unauthorized motorized trails is predicted to slow from its current pace due to the provision of adequate authorized trail opportunities.

App. 135; *see also* App. 98 ("It is also anticipated that, when quality trails are built, riders will use them. When riders use properly constructed trails, environmental impacts can be minimized, monitored, and controlled. No amount of restriction or enforcement can begin to provide the environmental protection

-20-

achieved through the provision of adequate facilities and rider education.").

Absent countervailing evidence in the record, we can conclude from the EA that the Forest Service took a hard look at the relevant information and determined that opening motorized trails would slow the creation of unauthorized routes in the area and, accordingly, the impact on fens in other parts of the Middle Fork IRA.

## B. *Impact on Non-Motorized Recreation*

BCA next argues that the decision has a significant impact because of the "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial." 40 C.F.R. § 1508.27(b)(4). "Controversy in the NEPA context does not necessarily denote public opposition to a proposed action, but a substantial dispute as to the size, nature, or effect of the action." *Middle Rio Grande Conservancy Dist. v. Norton*, 294 F.3d 1220, 1229 (10th Cir. 2002).

Specifically, BCA alleges there is a substantial dispute regarding the conflicts between motorized and non-motorized users. BCA makes two arguments to support this position, neither of which is persuasive.

### 1. *Internal Contradictions*

BCA first argues there is a wide disparity in the estimates of non-motorized users in the affected area, as evidenced by internal contradictions in the EA. In response to public comments about the EA, the Forest Service concluded, "the areas in question are used infrequently by non-motorized recreationists (indeed, if the opposite were true and they were popular non-motorized recreation

destination[s] or contained non-motorized trails, the proposed changes could have significant impacts)." App. 1118. But the Forest Service has also indicated that "many people value" the Middle Fork IRA's pristine condition and the opportunity for solitude. App. 602. According to BCA, those two Forest Service statements are directly contradictory.

Given the context, however, it is clear to us that, while "many people" may value the pristine condition of the Middle Fork IRA in general, those people do not necessarily value—let alone actually use—the relatively small Albany Trail area in particular for their non-motorized activities. Thus, we find no internal contradiction. The language is simply too unspecific to hold the weight that BCA attempts to give it.

### 2. Hard Look at Non-Motorized Recreation

Second, BCA argues that a substantial dispute arises because the Forest Service failed to substantiate its claims that the impact on recreation user conflict would not be significant.

Although the Forest Service eventually selected the Proposed Alternative, it also adopted the portion of the other "action" alternative, Alternative 2, that allowed opening the Albany Trail to motorcycle use. The Forest Service concluded that, regarding the impact on recreation opportunities and experiences, Alternative 2 "would the be same as the Proposed Action, with the following exceptions: . . .

Inventoried Roadless Areas (IRAs): . . . Designating 5.8 miles of motorcycle/ATV trails within the Middle Fork IRA would result in the loss of roughly 200 acres classified as Semi-Primitive Non-Motorized recreation.

Dispersed Recreation: Changes to dispersed recreation opportunities would occur locally due to slight differences in the transportation system. . . .

[Off-Road Vehicle (ORV)]-Caused Resource Damage: ORV user compliance with regulations is expected to increase from current levels, and could possibly increase more than under the Proposed Action for two reasons: 1) more overall ORV trails to ride; and 2) the inclusion of two popular motorcycle trails [including the Albany Trail].

*Recreation User Conflicts: No significant change from the proposed action.*

App. 94–95 (emphasis added).

BCA argues that section of the EA makes a conclusory assertion that the Proposed Alternative, which would have designated 12.2 miles of trail, and Alternative 2, which would have designated 80.2 miles of trail, would have similar impacts on conflicts between motorized and non-motorized recreation. Based on what BCA believes to be a hole in the Forest Service's logic, BCA argues that there is a substantial dispute about the action's effect on non-motorized recreation.

A substantial dispute can be found, for example, when other information in the record "cast[s] substantial doubt on the adequacy of the agency's methodology and data." *Hillsdale Envtl. Loss Prevention, Inc. v. U.S. Army Corps of Eng'rs*, 702 F.3d 1156, 1181 (10th Cir. 2012). BCA can point to no evidence in the record

-23-

contradicting the conclusion that the Proposed Alternative and Alternative 2 would have significantly similar impacts on recreation user conflicts.[8] Instead, BCA argues that there is not enough evidence in the record to support that conclusion. But a dearth of factual information cannot serve as proof of a dispute.

In absence of a substantial dispute, we consider whether the Forest Service took a hard look at the likely conflict between recreation users. The Forest Service points to several factual findings indicating that it took a hard look at the impact of the course of action it eventually adopted—the Proposed Action plus the opening of the Albany Trail.

First, the Forest Service identified in several sections of the EA that motorcyclists have been using the Albany Trail regularly for years. It is reasonable to suspect that existing motorists may have already caused non-motorized visitors who primarily value solitude to move to other parts of the Middle Fork IRA. *See* App. 133 (discussing general trends toward site-specific displacement as a result of "negative perceptions associated with ORVs and the spread of ORV use").

---

[8] BCA suggests the Wyoming Game and Fish Department's opposition to the decision to allow motorcycles on the Albany Trail provides evidence of a dispute. But the Department's comments focus on the impacts on wildlife, not user conflict. And we cannot infer from the Department's general opposition that the Department believes opening the Albany Trail would have significantly more impact on user conflicts than the Proposed Alternative.

Second, the Forest Service makes the related point that the Albany Trail is a very small part of the Middle Fork IRA. The Forest Service identifies that opening the Albany Trail required reclassifying 200 acres of the Middle Fork IRA's 13,000 acres. Thus, allowing off-road vehicles on the Albany Trail does not prevent non-motorized users from recreating in pristine areas of the Middle Fork IRA. For that reason, it is not the case that adding the Albany Trail to the list of trails opened under the Proposed Alternative undermines the Forest Service's conclusion that the action would not cause significant displacement. *See* App. 136 (indicating the Proposed Action "may result in the site-specific displacement of non-motorized recreationists, but no off-Forest displacement of non-motorized recreationists or loss in [Recreation Visitor Days] is expected.")

Furthermore, the Forest Service identified that opening the Albany Trail and a network of other trails may improve the experience of non-motorized users in other parts of the Middle Fork IRA because, especially given the popularity of the Albany Trail with motorcyclists, fewer motorized users are expected to use unauthorized trails. *See* App. 135–7, 266. Based on those sections of the Forest Service's analysis, we conclude that it sufficiently considered recreation user conflicts on and around the Albany Trail.

BCA also contends the Forest Service should have quantified the number of affected non-motorized users before reaching this conclusion. But, as we have already noted, the court's role is not to identify the ideal methodology but simply

to ensure that neither the agency's methodology nor its conclusions are arbitrary and capricious. Although the Forest Service's analysis does not involve the kind of empirical inquiry for which BCA had hoped, we cannot overturn the agency's conclusion simply because it is based on forest managers' observations of visitor behavior and common sense—especially since unauthorized usage is particularly difficult to measure.

Accordingly, we find the Forest Service's methodology and analysis rationally support its conclusion that designating the trails in the Proposed Alternative as well as the Albany Trail would not have a significant impact on recreation user conflict.

## III. Conclusion

The Forest Service action was not arbitrary and capricious. The Forest Service took a hard look at the relevant factors, and we can identify adequate support in the record for its conclusions. Finally, we note that BCA contends that it is entitled to a permanent injunction against the Forest Service, but, in light of BCA's failure to proceed on the merits of its principle claims, we are not persuaded that BCA is entitled to a permanent injunction.

We therefore AFFIRM the district court and decline to set aside the agency decision.